Actually, I'll call the next case. In Re Rotavirus Vaccines Antitrust Litigation Number 20-3460. Good morning, Your Honors. Ashley Bass on behalf of Appellant Merck, Sharp and Dohm. I'd like to reserve two minutes for rebuttal, please. That'll be granted. Thank you. Your Honors, the District Court erred in finding that plaintiffs are not bound to arbitrate their claims in this case. The arbitration clause is contained in the contract with Merck that governs their purchase of pediatric vaccines from Merck. The District Court erred with respect to both grounds that bind plaintiffs to that arbitration clause. With respect to agency, the District Court found that some sort of a clear statement was necessary from plaintiffs to the physician buying groups in order to agree to an arbitration clause in those contracts. That's contrary to Pennsylvania law and contrary to Supreme Court law. In addition, the court found that the contracts provide benefits to plaintiffs, but also found that those benefits were not sufficient in order for the equitable estoppel doctrine to apply. Again, that's contrary to the law of the circuit. Plaintiffs are bound to arbitrate their claims under the law of agency.  was no grant of agency. But you let me just stop you for a minute about agency because I think you told the District Court that you didn't have enough information to assert an agency relationship between the pediatricians and the PBGs, right? So at the time that at the well before you explain, is that right? That's not precisely what we said. All right. What did you say? So at the time we were at the motion to dismiss stage and we had moved on a 12 v 6 grounds in order to seek arbitration of these plaintiffs at the time that we moved. We did not have any sort of membership contracts or any other contracts from them that would evidence the agency relationship between the plaintiffs in their position buying groups that negotiate these contracts. Once they provided that in their opposition, they provided that information into the record at that point. We had the basis to argue that an agency relationship existed or that's an explanation, but you didn't tell me what you said. I thought you told the District Court that you didn't have enough information to assert an agency relationship. You're telling me that's incorrect. What did you say if that's not what you said? My memory is that we said that at the motion to dismiss stage we didn't have the information necessary to make that argument. We've obviously moved past that stage now into discovery. That was the prior procedural posture of the case was at the motion to dismiss phase. So what did you need to learn in discovery that told you that an agency relationship that you didn't know before discovery? Sure. So we've had a robust set of discovery now. So the plaintiffs have now produced extensive contracts that they have with the physician buying groups who are their agents in this case. So the documentary record is much more robust. We've also taken depositions of both plaintiffs and the physician buying groups where the physician buying groups testified  they enter into contractual negotiations with Merck. But isn't your argument that the physician buying group was your agent? No, your honor. Our argument is that the physician buying group was the agent of plaintiffs not our agent. That's why we needed the further documentary evidence from plaintiffs and from the physician buying groups themselves in order to prove up that agency relationship in order to show that the agents the physician buying groups had the authority to agree to an arbitration clause on behalf of their members and plaintiffs are members of the physician buying group. Okay. All right. So as I understand it, you're saying once you saw the contracts between the PBGs and the pediatricians you learned about the agency relationship. Correct. So prior to that, I guess your argument would have been limited to a parent agency that when you were contracting with the PBGs you had some expectation or understanding that the PBGs were negotiating on behalf of the pediatricians, but you weren't sure about that? It was certainly our expectation. But again, we were limited somewhat by the 12B6 nature of the case at that point. And so we had what was pledged in the complaint and what was then, you know, integrated into those pleadings. And that's what we moved on on the 12B6. And that was actually the whole point of the prior panel's discussion here that we had on the first go around was that the court felt like that the pleadings weren't sufficient at that point to grant arbitration, but that the parties should go back and engage in the full discovery on the arbitration issues so that we could come back before this court and present information that evidences the agency relationship and also evidences the equitable estoppel theory. Okay. All right. One last question on that issue. As I recall, some pediatrician groups came to the arrangement after the fact, after you had your deal with the PBGs. Does that change things? And if not, why? No, for two reasons. First off, the three plaintiffs that are at issue were all members of the PBGs before the operative contract was negotiated with Merck. That negotiation happened in 2012. And all three of the plaintiffs in this case were members of their PBGs before that negotiation happened. And even if that weren't the case, here, what the contract says is that the PBG is representing to Merck that it has the authority of its members to enter into the agreement and that its members have to expressly ask in order to be listed as part of the agreement. So for both reasons, this timing issue, number one, is inapplicable. But number two, it doesn't have anything to do with the legal sufficiency of the PBGs to be able to act as agents on behalf of their members. Something we have to look at is control. And I mean, do folks who are not member clinics that aren't even involved with Merck, I mean, how can they exert control over the arrangement, whatever it is, if they're not even involved? So the way that the district court framed it was that there was obviously some limited delegation of authority that occurred here. There was a delegation from the plaintiffs to the PBGs to at least arrange for contracts for the purchase of vaccines. What the district court said was, well, the control, it seemed like they didn't control the negotiations. Control over the negotiations isn't what's required under Pennsylvania law. Control over the means of performance is not required. The principal simply just needs to tell the agent what the job is. And they specifically did that here. The plaintiffs said, and it's in the contracts between the plaintiffs and the PBGs, they said, PBGs, we want you to go arrange for a contract so that we can purchase pediatric vaccines from Merck. And as part of that process, it was completely usual, reasonable, necessary for the agents to agree to an arbitration clause. So control over those negotiations isn't what's required. And the case law is quite clear that if an agent is operating within their scope to negotiate a contract on behalf of a principal, then there's no requirement that the agent then tell the principal before they agree to an arbitration clause. Well, let me hit you with a hypothetical then. What if a new member clinic signs up with the PBG? Is there an agency relationship then? I mean, if it happened today? If a new member were to sign up today, we would argue that there is an agency relationship because the new member has the full ability in order to ask questions of the agent, to ask to see any of the contracts at issue, the membership agreements say... How do they control? How does a totally new entity control the PBG then? Well, at that point, again, they have the opportunity not to receive the discounted prices from Merck. But if they are going to receive the discounted prices, then they need to be able to take the contract as it's been negotiated by their agent. In the membership agreements, they say, I'm going to sign up to be a part of the agreement. So I think from our perspective, the issue there is that once they say we want you to be our agent, then they take the discount subject to all the rights and obligations that come in the contract. And one of those obligations is arbitration. And the arbitration clause is not only in the PBG contracts that Merck has. Arbitration clauses are in all the contracts  is that the agent is going to be able to take the contract from Merck is that if you're going to purchase from us and you're going to receive discounts, then you're subject to an arbitration clause for those purchases. The whole point of the PBG arrangement is to get the discounts, isn't it? That is a significant part of it. There's also an efficiency part on Merck that we don't think need to contract with all of the various kind of member, you know, the people, pediatric clinics. I understand that's your motivation, but their motive, the practice's motivation of joining the PBG is to get the price discounts, right? Or is there some other motivation? That's a very strong motivation to get the price discounts. All right. And the essence of your argument, as I understand it, is they've got to take the bad with the good. They don't want to arbitrate. They want to go to court. You want to arbitrate and your position is if they want the discounts, they have to arbitrate. Correct. Is it that straightforward? It's that straightforward. And that's the agency issue that once they dispatch the agent to deal with us and the agent agrees to an arbitration clause as part of the contract, as part of the receipt of these to the arbitration clause. Similarly, under equitable estoppel, once they receive these direct benefits from the contract, they can't say, well, we want the benefits, but we don't want to take the rights and obligations of the arbitration clause. All right. That's a part of it. But the next level, as I understand their argument, we'll hear from Mr. Silverman is the benefits weren't all they were cracked up to be. And if you weren't controlling the market, you know, that's why they have an antitrust claim, right? Their theory of the case is that they're not really getting benefits, that you're controlling the market, jacking up the prices, and all they're doing is trying to mitigate that. What's your response to that? Assuming I've correctly stated their argument. That is their argument. We obviously disagree with it. But even the Supreme Court has said that you can't consider the merits when you decide whether arbitration is the means for resolving the dispute, right? So here, all we're saying is that their dispute, what's the forum we should hear it? Should we hear it in court? Should we hear it in arbitration? The fact that they claim that the benefits weren't good enough, that the discounts weren't good enough, that's an issue that the arbitrator should decide. All right. So that issue stays live. It just is live for the arbitrator, not the court. Exactly. And the cases are pretty clear on that. They're really, you know, consideration of the merits is not something that we should get into when we're deciding whether or not parties have agreed to arbitrate a claim. You mentioned equitable estoppel. If I could just direct you there for a minute. Perhaps you could distinguish our Boreas decision where we held that a non-signatory, one step removed from an agreement couldn't be equitably estopped from avoiding an arbitration clause there. Yes, Your Honor. In Boreas and in Griswold and in DuPont, there was this feature that there was something else that the plaintiffs were basing their claim on, and that was the issue in Boreas, that there was a separate agreement, separate, you know, representation that served as the basis for the claim in that case and such that the agreement that contained the arbitration clause was not the reason that the claim was going forward. And that really saved the day for all three of those plaintiffs in those cases. That's not what we have here. Here, the agreement with the PBGs is literally the agreement that they are challenging. In their complaint, they say that it's an unlawful agreement. They're challenging the discount structure that is set forth in that contract. So here, there is not any other sort of contract that exists or other agreement that exists that they are challenging. It is literally the rebate structure that is set forth in the Merck contract that provides their claim in this case. So with respect to equitable estoppel and with agency, you know, part of their argument is... You don't get to equitable estoppel if we agree with your agency argument. We don't need to, right? That is accurate, Your Honor. If you agree with us on the agency front, there is no need to move to equitable estoppel. So here, Your Honor, under both of the theories that we have put forth, under agency and equitable estoppel, the plaintiffs here are bound in order to arbitrate their claims here. It really is a situation where the court below in saying that while some further grant of authority was needed in order to reach one arbitration clause or some sort of arbitration clause, was really placing heightened requirements around arbitration. The court was treating arbitration in a way that is skeptical of arbitration, something that we have certainly moved away from in the U.S. court system and certainly with the Supreme Court's decision in Kindred, any requirements that the court thought existed in Pennsylvania law would be preempted if they did exist. That arbitration has to be on equal footing with all other contractual provisions and the finding here that there was some delegation of authority to an agent to enter into a purchase contract was enough here for these agents to agree to arbitration as a usual method of resolving dispute. I see my time is up. Okay. Thank you, counsel. We'll get you on rebuttal. I'd ask the court prior to come over for a minute. Thank you. You may proceed. Good morning, your honors. My name is Daniel Silverman and I'm from the law firm Cohen, Milstein, Sellers & Toll. On behalf of the plaintiff at Appalachia, Schwartz Pediatrics, Sugarcane Pediatrics, and Margiotti & Kroll, this court should hold that plaintiffs are not bound to arbitrate because there     The plaintiffs are not bound to arbitrate this dispute. The plaintiffs are not bound to arbitrate this dispute. In particular, because this dispute is not within the scope of the relevant arbitration clause. Section 4.6 of the Merck PBG agreements, the agreements that Merck has known all along, that Merck wrote and drafted, require the PBGs to communicate the applicable terms to the eligible clinics, but no PBG communicated the arbitration clause to a single one of their thousands of members. So you just proved your agent let you down. Say again? But that's an argument that your agent let you down. They were a bad agent, right? I mean, that's not that's not Merck's problem. If the people that you're relying on to negotiate discounts don't communicate with your clients, that's a problem you should address with the PBG, not Merck, right? So your honor, your honor, you're correct that if there was an agency relationship, that the failure to communicate the relevant terms and conditions would be a breach of the fiduciary duty. But here, the fact that they didn't, if they had failed to communicate the arbitration clause to one or two of the members, that would be a failure of their fiduciary duty. But the fact that they didn't communicate it to any of their thousands of members, not just these three plaintiffs, but their thousands of members, indicates that they must have believed that it never applied to disputes with the eligible person. Right, and that they must have believed is really important here, I think, because that's really what the district court focused on, right? The district court latched onto the absence of knowledge that your clients had, that they were in the dark, essentially, right? That was an important part of the district court's holding, for sure. And I'm not sure I understand the salience of that when trying to determine whether an agency relationship existed. Well, your honor, let me give you a hypothetical. You have an arrangement with a stockbroker. The stockbroker makes trades on your behalf. The stockbroker has an agreement with the market maker that's causing the transaction to be put into motion, that if there are any disputes, they have to arbitrate. If your stockbroker doesn't tell you about that, and you place a trade, let's say you give your broker discretion, your broker buys 100 shares of Company X, and it's not a trade that you like, you're still sort of stuck with the trade, aren't you? Because that broker is acting on your behalf, at your behest, the broker's your agent. And it doesn't really matter how much or how little your broker tells you about whether you need to arbitrate or go to court or etc. Does it? In that situation, I think you're correct, but that situation is just very distinguishable from the one we have here. And the reason is because there's different types of agency, right? So there's very broad types of agency where the principal delegates a very broad authority to their agent to make lots of decisions on their behalf, and they can tell them, I want you to go out and take care of this. I don't want to deal with it. I don't want you to tell me. I'm delegating you discretion to deal with that issue. But that's not the type of agency that existed here. The restatement points out that agents often have authority to negotiate or to transmit or receive information on their authority to bind their principals to contracts. Now, that's a sort of an unusual type. You're saying the PBG's here didn't have authority to bind your clients? So we're arguing in the alternative, Your Honor, first that they weren't agents at all. So they did not have authority to bind our clients to anything. What was the point then? What exactly were they doing? If they had no authority to bind you to anything there, you're saying they were just there to shuttle information back and forth? Well, so, Your Honor, essentially it's just like a bind. It's very similar to an insurance company, for example. So we, in our briefs, we've cited a number of cases involving insurance companies where insurance companies negotiate rates with providers. So this happened in the Seops case, for example, with Kaiser. And the insurance company then has members who then pay those rates. But that doesn't mean that the insurance company is an agent. So there's lots of situations where you have an intermediary who negotiates rates for a whole group of people who are members who then can get those rates. And that whole arrangement can be created through arm's length contracting. You don't need to have an agency relationship. And in fact, in Seops, the court found, the Hawaii Supreme Court found, that a relationship that was almost identical to this one, where you had an insurance company, a bunch of members, the contract between the insurance company and Kaiser said that they were an agent negotiating on behalf of their members. Nevertheless, the Hawaii Supreme Court said none of that creates the agency relationship to create the authority to bind the members to an arbitration clause in the contract between the insurance company and the provider. And it was the same situation in Sutter. And frankly, Your Honors, there's very few cases out there that we've been able to find. I don't think Merck cites any that have found agency authority in a circumstance like this with a buying group. And the fact of the matter is you just don't need it in order to have this arrangement work through arm's length contracting. And that's the way all the... But then when they get discounts for you, they're acting ultra-virous? I mean, if they don't have authority to bind you to a six percent discount for drugs, then that discounts a nullity under the law? Your Honor, I think that if our plaintiffs sued Merck, if Merck decided to get rid of the discounts and our plaintiffs tried to sue Merck, I expect Merck would argue that we do not have a binding contract with them and that we could not enforce those discounts. And in fact, the contracts themselves don't bind Merck to the discounts at all, that they can change the prices at any time under those contracts. So there isn't much of a binding agreement here at all. So are you saying your deal with the PBG is illusory then? Well, it's not that the deal is illusory. It seemed like I might be oversimplifying the nature of the contract, but I thought the whole point of the physician buying group was for a group of small practices to increase their purchasing power through the creation of a physician buying group and that physician buying group could negotiate better rates for all of its members. As Ms. Bass just pointed out, Merck gets a benefit because instead of dealing with myriad small practices, they can just deal with the intermediary and your clients get a benefit in the form of discounted rates and in exchange for those provisions of the contract that provides for the discounted rates is a provision that any disputes must be arbitrated. What am I missing? Well, so your Honor, a couple of things about that. First of all, it's not true, although the PBGs market themselves this way, it's not true that they're actually getting discounts by aggregating volume of purchases. The reason for that is because as Merck testified in their 3036 deposition, the prices in every single PBG agreement are identical. Now, that includes very small PBGs and much larger PBGs. So the discounts are really about, are in exchange for administering Merck's loyalty program. It's about one entity rather than dealing with the myriad individual products. That's right. So it has more to do with efficiency of the loyalty program than the purchasing power of how many people are in the group. And in fact, Merck's document, and because the PBGs are administering this loyalty program, that's exactly why they're not acting as agents for their members. They're really acting as a sales agent for Merck. Merck's document said that in fact the PBGs are managing the contract for them. And in fact, they're doing that because they're not communicating those loyalty requirements specifically to the members. So the contract between Merck and the PBGs says that the membership as a whole needs to maintain 80% loyalty for road attack, Merck's rotavirus vaccine. But the PBGs, if they were agents of their members, they would have fiduciary duty to share that information with their members. You could purchase 85%. You could still get these discounts. If everyone does that, we'd all still get these discounts. You know, an agent has to act for the benefit of their principals. I would assume you would agree that you can be a bad principal and a bad agent and still have an agency relationship, right? Because it seems like you keep coming back to this idea that well, they should have done this and they should have done that perhaps. But why does that alone prove that there isn't an agency relationship, even if it's one that you find dissatisfying? So, Your Honor, as I mentioned earlier, it's true that if you establish an agency relationship, then that agent could violate the fiduciary duty and still be an agent. But here, the sheer amount of evidence that came out in discovery, I think illustrates that no one really believed they were agents to begin with. And I think that's illustrated also by the fact that Merck, as Judge Hardiman mentioned during their oral argument, didn't even assert this agency argument to begin with. And Merck said they had no way of knowing that they were an agent because they didn't have the membership agreements. But the Merck PBG agreements, which they point to now, also say that the PBG has the authority of their members. And Merck also makes an apparent authority argument where they're saying that, well, by purchasing at these discounted prices, the members led us to believe that the PBGs were agents. So it honestly just doesn't hold water, the argument that they thought they were agents all along. I think no one believed they were agents from the beginning. And in addition, there's other evidence that came out in discovery that demonstrates that as well. So I mentioned that the PBG agreements with Merck have an 80 percent requirement. The PBGs then choose their own percentage loyalty requirement that they impose on their members. So MSV imposed a 90 percent requirement, and CCPA imposed a 100 percent requirement. And Merck knows that the PBGs are communicating a different percentage to their members than the 80 percent, and they in fact see that as an advantage because the PBGs can have a lot of control over the members purchasing behavior. Just going back for a minute to implied authority, your adversary seems to rely pretty heavily on the Dye case in the 11th Circuit. Assuming that there is some level of express authority here, how do you distinguish Dye? Your Honor, Dye involved someone hiring a roofer to build a roof for them and who had express authority to purchase shingles on their behalf. Here the PBGs have no express authority to purchase anything on the member's behalf. So that's a very easy way to distinguish it right off the bat. Well, like I said, let's assume that we find there's express authority. So if you assume, you could find there's express authority, but that could be a lot of different things. And in fact, if we look at the membership agreements, which are the only source of authority at all that Merck has pointed to, you need a manifestation of express authority and it has to be deliberate and specific. Merck points to the membership agreements that say non-exclusive agent to arrange for the purchase of goods and services, but those exact same agreements also say nothing in this agreement shall require the provider to participate in any specific vendor agreement. And it also says the GPO will notify provider of the vendor arrangements available from time to time and the applicable terms and conditions of such arrangements. And I think when you read all of that together, it's clear that the use of the term agent there doesn't mean, it does not create authority, any express authority for the PBG. I don't know if you're answering my question. I said, let's assume that there is some level of express authority here, then how do you distinguish die? And you respond, there's no express authority. I should assume it. No, Your Honor, let's assume that there is express authority. Absolutely. There still remains the question, well, what is that express authority for? And I think the way to distinguish die is that that express authority was not to purchase something on behalf of the plaintiffs. The express authority was simply to arrange for the purchase of goods and services. That's it. That's the express authority. We have to ask, well, what does that mean, right? And what that means is not you can go out and purchase something for our behalf. And if you read these other provisions, you see it also can't mean that you can bind us to this contract. We're giving you discretion. Merck argues they gave them broad discretion to agree to whatever they needed to. But that's not, when you read this membership agreement, that's not what's happening here. Instead, they're saying, you can represent that we're a member of the group, but that's it. You have to then come back and give us the applicable terms and conditions, and we'll decide whether we opt in or not. That's a very different type of authority, if there is authority at all. Let's assume that there is. That's a very different type, but completely different from the situation in Diabetes Tampa. All right, I asked your adversary about other member clinics that maybe weren't signed up here, or maybe even ones that opted into the PVG later. She seems to think they're all covered by the arbitration agreement. Maybe you could address her argument there. And how significant is that, that even member clinics or physician groups that weren't part of it are later bound? Your Honor, I think it's incredibly significant, because even if these particular plaintiffs joined earlier, the fact that the PVG treats all of the members the same, regardless of when they joined, illustrates that the type of control that's necessary to establish an agency relationship just doesn't exist in this particular arrangement, for any of the members, whether they joined before or after. And in fact, even for the members who joined before, you have the same issue with amendments. So Merck talks a lot about an amendment in 2015 that they issued. But the PVG, the CCPA actually testified that when Merck issues an amendment, that Merck asks them not to send it to the members, and they follow those instructions and keep it confidential from their own members, who they're supposed to be an agent for, until Merck can communicate those terms. And so all of these things combined just make clear that this is, that it's a huge stretch to read this as an agency relationship at all. And if you do read it as an agency relationship, it's got to be a very limited, narrow one, and one that does not include authority to bind to undisclosed terms. Because again, as we said in the membership agreement, they said, you're going to take this contract, you're going to tell us applicable terms, you're going to put it in front of us, and then we can decide whether we want to opt in or not. But only to the terms that are presented to us. And if you look at the forms themselves, they don't incorporate by reference some other contract. They don't say, you're agreeing to all of these terms in this other contract. They say, you're agreeing to the terms right here. And those terms are just the loyalty terms and the prices, the discounts, and that's it. Your Honor, I just, I'm running out of time, but I just want to point out that scope, that there is the issue of scope in this case, which is dispositive. Which is, even if Merck is correct about their agency, and even if you buy Merck's arguments on agency and estoppel, you still need to find that this dispute is within the scope of the arbitration clause. And I think our brief lays out compelling reasons to believe it's not. Thank you very much. Thank you, counsel. Do you have anything to add? Okay, thank you, counsel. So, Your Honors, Mr. Silverman discussed how, the reasons that he feels that there's not an agency relationship here. So, just to run through the facts, I mean, here, this is a case where the district court did find that there was some grant of authority from the plaintiffs to the PBGs. There was some grant that the court viewed as being an authority grant from the plaintiffs to the PBGs. In addition, as we pointed out in our briefing, these PBGs exist under federal statute. They exist pursuant to the federal anti-kickback statute, which says that they serve as agents on behalf of their members. So, the federal statute that actually allows these PBGs to exist specifically says in the statute that they're agents for their members. So, the concept that no one thought that PBGs were agents simply just fails at the first premise. Well, you knew about that statute at the pleading stage, and you told us earlier that you only knew about the agency relationship after you saw the contract, so. We were still bound by what was in the record. I mean, the GEODOTTI is very strict about what can occur on a 12b6 standard in order to show arbitration. And so, we were attempting to abide by what GEODOTTI says in terms of the complaint and the documents that are referenced therein in order to show that agency relationship. What about the scope issue Mr. Silverman referenced? Because you just said correctly that the district court found that there was some authority given from the practices to the PBG. I just heard him say, well, to the extent that's correct, the authority was limited to certain items, certain disclosed items, namely the discount and the loyalty percentage and not the arbitration requirement. Why is he wrong on that? The problem there is that the grant is quite broad. The authority to arrange for the purchase of goods and services, that is a broad grant. And the cases that we cited in our briefing are very consistent on the fact that once you dispatch an agent to deal with another in terms of services, either to purchase them themselves or to engage in that contractual relationship, then there is nothing unusual about agreeing to an arbitration clause. And as a matter of agency, the arbitration clause then becomes binding on the agent, even if, on the principle, even if they did not know about the arbitration clause before the agent agreed to it. What about PSYOPs? You don't cite that in your reply brief. For both of those cases. Is it just, do you think it's wrongly decided or do you have a way to distinguish it? Yes, for both of those cases, one is in Hawaii and I believe one is in California. There's state court decisions that are not addressing Pennsylvania law, which is the law at issue here. And frankly, they seem quite off point in terms of the issues that we are addressing here. And so Pennsylvania law controls, we focus on the Pennsylvania law that controls this issue. Under Pennsylvania law, the cases are very consistent that an agent acting within the scope of its authority can bind the principle to an arbitration clause. There's nothing unusual about that. And there's no need to give notice that the agent plans to do that in advance. There's no specific requirement under Pennsylvania law that you have to go to your principle in advance and say, hey, I plan to agree to an arbitration clause once you've given me the authority to arrange for the purchase of goods. And that's what we focus on, which is the Pennsylvania law that controls here on that issue. All right. Thank you, counsel. Appreciate it. We'll take this case under advisement and thank    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.